UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| NAKIA CLARK, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
|    v. | ) Case No. 2:23-CV-290-PPS |
| | ) |
| HARD ROCK CASINO NORTHERN | ) |
| INDIANA, | ) |
| | ) |
|    Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Nakia Clark worked as a Server for Defendant HRNI Holdings, LLC, the owner of the Hard Rock Casino in Gary, Indiana. By all accounts, she had a rocky one-year tenure in this position. Clark admits she violated HRNI policies and standard operating procedures on numerous occasions, including an October 2021 argument with her manager that resulted in a temporary suspension and written warning. But Clark says the root of her troubles were her manager's discriminatory treatment of her because of her race and the inconsistent application of policies. HRNI seeks summary judgment on Clark's claims brought under Title VII and 42 U.S.C. § 1981. Because there is simply no evidence from which a reasonable juror could conclude that HRNI sacked Clark because of her race, HRNI's motion for summary judgment will be granted.

**Factual Background**

Several HRNI handbooks, policies, and procedures are relevant to this case, so I'll march through these first. HRNI has a Progressive Coaching and Counseling Policy

1

in its Team Member Handbook. The Progressive Coaching and Counseling Policy establishes a four-step disciplinary process: (1) verbal warning; (2) written warning; (3) final written warning; and (4) suspension pending investigation / termination. [DE 45-8 at 2.] However, "[d]epending on the severity of the violation, some or all of these progressive disciplinary steps may be bypassed." [*Id.*] In practice, HRNI uses suspension as a tool to investigate conduct and does not necessarily view it as a separate level of discipline. [DE 47 at ¶12; DE 45-13 at 54–55.]

The Team Member Handbook also contains an Expressly Prohibited Conduct Policy, which includes a non-exclusive list of prohibited offenses. [DE 45-9 at 2–3.] Much of it is obvious. Things like stealing, refusing to comply with a supervisor's instructions, insubordination, being disrespectful to guests or co-workers, or ignoring HRNI policies can get you in hot water or lead to an "immediate termination of employment." [*Id.* at 2.]

A second relevant handbook is the Cocktail Server Handbook. This Handbook contains a Cigarette Purchase Standard Operating Procedure (the "Cigarette SOP"). Guests may pay for cigarettes with cash, chips, credit card, room charge, or they may request a "comp." [DE 45-10 at 2.] A "comp" in the gaming world is a complimentary item given to gamblers to encourage them to keep playing. When a guest requests a pack of cigarettes under HRNI's comp or unity points system, the Cigarette SOP requires servers to ask for a guest's "wild card and photo ID." [DE 47 at ¶18; DE 45-10 at 2.] Servers must "[a]lways ask for a photo ID to confirm that the name on the wild

card matches the name on the photo ID." [*Id.*] In addition, servers "must always keep paper comps for their bank and ensure they are signed by the guest." [*Id.*]

The Cocktail Server Handbook also contains a Tray Standards Policy, which requires servers to always serve customer drinks on a tray. [DE 45-14 at 2.] The Policy is borne out of efficiency: it's designed to "ensure fewer trips back and forth [from the bar] and to deliver quicker round times for our guests." [*Id.*] Finally, servers must also comply with the Food and Beverage Cash Handling Policy. Under this Policy, "Comps, Room Charges, and CC Receipts MUST be signed by Guest and verified with valid identification." [DE 45-11 at 3.]

Clark began working as a Server at the Hard Rock on April 19, 2021. [DE 47 at ¶2.] Beverage Supervisors are responsible for managing Servers, though in practice HRNI had a fluid chain of command that varied by staff availability and shift. [*Id.* at ¶¶7–8.] Beverage Supervisors John Cuevas, Samantha McCune, and Clarice Hill most often worked the same shift as Clark. [*Id.* at ¶9.] On Clark's digital coaching log, HRNI documented four instances of coaching and counseling for alleged violations of HRNI policies and procedures from July 26, 2021, through October 2, 2021. [DE 45-12 at 2.] Clark refutes the bases for some of these incidents. [DE 47 at ¶25.]

Things came to a head in this case during an October 23, 2021, incident. Several sources document this incident. Clark's digital coaching log recorded the incident as follows: "Nakia insubordinate over radio, not willing [to] mak[e] rounds on the floor when asked. Per HR-written final." [DE 45-12 at 2.] Clark also admits she violated HRNI policies and procedures by having an "excessive well time." [DE 47 at ¶26.] Later

3

that evening, Clark called over the radio to request that Beverage Supervisor John Cuevas come to her bar. [*Id.* at ¶27.] Cuevas was unavailable, so Beverage Manager Kylah Bishop responded. [*Id.* at ¶28.] Clark told Bishop over the radio that she did not want Bishop's help; she wanted only Cuevas to respond. [*Id.* at ¶29.] In her deposition, Clark admitted her response to Bishop was inappropriate. [DE 48-7 at 95.]

When Bishop arrived at the bar, Clark told Bishop to leave her alone and questioned why Bishop was still at work. [DE 47 at ¶31.] In her deposition, Clark acknowledged these comments were inappropriate. [DE 48-7 at 100–01.] Bishop told Clark to come with her to the security office to meet with Cuevas. [DE 47 at ¶32.] Clark told Bishop she first wanted to drop off a round of customer drink orders. [*Id.* at ¶¶33, 35.] Bishop viewed Clark's refusal to immediately accompany her to the security office as insubordination. [*Id.* at ¶34.] At the security office with Bishop and Cuevas, Clark told Bishop she did not want Bishop's help because of her poor attitude towards Clark. [*Id.* at ¶36.] Clark also questioned how Bishop got her position with HRNI because Bishop had no prior casino experience. [*Id.* at ¶37.]

When she walked out of the security office after the meeting with Cuevas and Brown, Bishop ran into VP of Food and Beverage Patrick Brown in the hallway. [*Id.* at ¶38; DE 45-13 at 33.] Bishop told Brown of the meeting with Clark, and Brown decided to send Clark home and suspend her pending an investigation of her conduct. [*Id.* at 33–34.] Brown issued Clark a Final Written Warning, which was upheld at the conclusion of the union grievance process. [DE 47 at ¶¶39–41; DE 45-2.] The Final Written warning described the events of the October 23 incident, referenced Clark's four prior incidents

4

of verbal coaching in 2021, and warned "[f]urther performance instances [ ] may result in separation." [*Id.* at 2.] Clark signed her final written warning on October 30, 2021, which she said was the day she returned to work from her suspension. [*Id.* at 3; DE 48-7 at 98.]

Clark submitted a written complaint that captures her contemporaneous thoughts on the October 23, 2021, incident. During her deposition, Clark provided contradictory and unclear testimony concerning when she made this complaint. At one point she said she wrote a formal complaint several days before the October 23 incident, but she also suggested she submitted her complaint on the day of the October 23 incident. [*Id.* at 98–100.] The only written complaint in the record is a "Security Department Voluntary Statement" written by Clark and dated October 23, 2021, at 11:12 pm. [DE 45-3 at 2.] In that statement, Clark said she preferred to deal with Cuevas because Bishop is "known to have a snarky attitude, tone, and makes shady remarks." [*Id.*] Clark claimed that Bishop "[got] in [her] face" and told her that Clark would have to deal with Bishop. [*Id.*] Clark admitted to refusing Bishop's command to go to the security office, and she did it because of Bishop's "poor attitude towards me." [*Id.*] Clark said Bishop sent her home "as if I am a threat towards her which I am not." [*Id.*] Clark said Bishop took Clark's written complaint to Brown. [DE 45-4 at ¶10.]

After the October 23, 2021, incident, Clark returned to work. Her digital coaching log reflects six additional incidents of "coaching" from January through March 2022. Five of the six reflect problems with job performance ranging from things like "dropping her bank" to not letting her co-workers know when she was using to

5

bathroom. [DE 45-12 at 2.] There is one positive coaching moment where Clark was "celebrated" for complying with the Tray Standards Policy. [*Id.*]

Thereafter, on May 2, 2022, Clark did not check a customer's ID when he purchased cigarettes and sold four cartons of cigarettes to one customer within a 24-hour period. [DE 47 at ¶¶42–43.] Clark also signed the customer's receipts herself. [*Id.* at ¶44.] Clark says management told her in a pre-shift meeting that Servers did not need to check ID if they knew the person and says HRNI policy did not clearly define the 24-hour period that limits single customer cigarette sales. [*Id.* at ¶¶42–43.] Clark suggests she thought HRNI policy prohibited sales in excess of two cartons of cigarettes per person in one calendar date while HRNI policy prohibited such sales in a single 24-hour period (irrespective of the calendar date). Clark submitted a Voluntary Statement Form in which she admitted to the policy violations and noted her confusion over the 24-hour period. [DE 45-5 at 2.]

On May 7, 2022, HRNI management instructed Clark to never sign a receipt for a guest. [DE 47 at ¶46.] Yet, on the very next day Clark admits she signed a receipt for another guest. [*Id.* at ¶47.] Clark also admits she violated the Tray Standards Policy on May 7 and May 8. [*Id.* at ¶48.] At the time of these violations, Clark remained on her final written warning from the October 23, 2021, incident. In consultation with other management and Human Resources, Bishop decided to terminate Clark. [*Id.* at ¶50.]

HRNI terminated Clark on May 10, 2022. [*Id.* at ¶51.] HRNI's Performance Documentation form for Clark's termination list the May 2, May 7, and May 8 violations

6

of the Cigarette SOP, the Food and Beverage Cash Handling Policy, and the Tray Standards Policy as the reasons for her termination. [DE 45-6 at 2.]

## Standard of Review

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation omitted). On a motion for summary judgment, all facts and reasonable inferences are construed in a light most favorable to the non-moving party. *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025).

## Discussion

Clark filed a two-count complaint against HRNI on August 28, 2023. [DE 1.] She alleged racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The Parties in December 2024 agreed to dismiss Clark's retaliation claim, which leaves only her race discrimination claim for adjudication. [DE 27; DE 28.]

Title VII makes it unlawful for an employer to refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of that individual's race, color, religion, sex, or national origin. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018); 42 U.S.C. § 2000e-2(a)(1). Section 1981 also prohibits racial

7

discrimination and "provides a federal remedy against racial discrimination in private employment." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789 (7th Cir. 2019).

"The legal analysis for discrimination claims under Title VII and § 1981 is largely identical." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). To survive summary judgment on these discrimination claims, Clark must present evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The one caveat to the general overlap between these two statutes concerns causation. Under Title VII, the plaintiff must show race was a "motivating factor in the defendant's challenged employment decision." *Lewis*, 36 F.4th at 759 (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020)). Section 1981 requires more: "a plaintiff bears the burden of showing that race was a but-for cause of [her] injury." *Comcast Corp.*, 589 U.S. at 333.

Evaluating discrimination claims using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) remains an efficient way to organize, present, and assess evidence related to claims of discrimination. But it's not the only way to analyze a discrimination case. As the Seventh Circuit explained in *Ortiz*, courts may take a holistic approach and simply view all the evidence, direct and circumstantial, place it into a pile, and ask whether a reasonable juror could conclude based on all the evidence that discrimination was afoot. 834 F.3d at 765. In a recent concurrence, Justice Thomas suggested the same thing. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 313–

8

19 (2025) (Thomas, J., concurring). Nevertheless, the Parties in this case have hewed closely to the *McDonnell Douglas* framework, so I will do so as well.

Under *McDonnell Douglas*, a plaintiff must make a *prima facie* case by showing (1) they are a member of a protected class; (2) performed reasonably on the job in accord with their employer's legitimate expectations; (3) were subjected to an adverse employment action despite their reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff makes out a *prima facie* case, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action, at which point the burden shifts back to the plaintiff to present evidence that the employer's explanation is pretextual. *Id.* As alluded to in *Ortiz*, there is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's protected status. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894-95 (7th Cir. 2018).

At least one of Clark's theories of discrimination satisfies the first and third elements of a *prima facie* case under the *McDonnell Douglas* framework. Clark, an African American woman, is a member of a protected class. Clark claims she suffered two adverse employment actions: (1) her suspension and associated final written warning and (2) her termination. HRNI concedes, as it must, that Clark's termination was an adverse employment action. HRNI, however, disputes that Clark's suspension and final

written warning was an adverse employment action. I set this dispute aside for now because both alleged adverse actions hinge on Clark's ability to demonstrate that she met HRNI's legitimate expectations and that similarly situated employees were treated more favorably. If she cannot do so, answering the question of whether her suspension and written warning was an additional adverse action becomes irrelevant. For purposes of this opinion, I will assume both alleged actions were adverse and treat them interchangeably when evaluating Clark's conduct and HRNI's justifications.

HRNI argues Clark's numerous admitted policy violations demonstrate she failed to perform in accordance with her legitimate job expectations. Regarding the October 23, 2021, incident, Clark acknowledges she (1) had excessive well time, (2) unprofessionally told Bishop to leave her alone, (3) disregarded Bishop's order to immediately report to the security office, and (4) acted disrespectfully and unprofessionally towards Bishop in the security office. [DE 47 at ¶¶26, 31, 33, 36–37.] In addition, Clark admits to violations of the Cigarette SOP, the Food and Beverage Cash Handling Policy, and the Tray Standards Policy on several occasions in 2021 and 2022. [*Id.* at ¶¶42–48; DE 48-7 at 79–84.] Despite these admissions, Clark tells me she was a swell employee. [DE 49 at 5–7.]

Because of her admitted policy violations, Clark primarily argues HRNI applied its legitimate employment expectations in a disparate, discriminatory manner. Relatedly, she argues HRNI's reasons for suspending her, issuing her a final warning, and terminating her were pretext for racial discrimination. This dispute illustrates the interconnectedness of the elements of the *McDonnell Douglas* framework and

consideration of pretext. In fact, "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner . . . the second and fourth prongs merge—allowing plaintiffs to stave off summary judgment for the time being, and proceed to the pretext inquiry." *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)).

Thus, Clark can clear her *prima facie* hurdle even if the evidence suggests she had not performed up to HRNI's expectations. In situations such as these where there is an admission of policy violations, the Seventh Circuit has explained that it "makes little sense" to discuss whether an employee was meeting their employer's reasonable expectations. *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001) (citation omitted). That's because the employee argues instead that they were singled out for discipline based on a prohibited factor. This argument is best saved for analysis of pretext. *Id.* at 478. Following the Seventh Circuit's lead in *Curry*, the Court focuses its analysis on Clark's allegations of similarly situated comparators and on pretext.

Plaintiffs may demonstrate discrimination by pointing to differential treatment of a "similarly-situated employee who was not in the protected class." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). The Seventh Circuit has cautioned against too rigid an application of this analysis. The examination is "flexible" and considers all relevant factors. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (citation omitted). Common factors include whether the individuals had the same supervisor, were subject to the same standards, engaged in similar conduct, and lacked

11

differentiating or mitigating circumstances that distinguished their conduct. *Id.* But at bottom, the analysis focuses on "eliminat[ing] confounding variables" and deciding whether "there are enough common features between the individuals to allow a meaningful comparison[.]" *Id.*

Clark claims four white employees received more favorable treatment and are illustrative of HRNI's disparate application of its employment expectations. These individuals are: (1) Gabrielle Szotak, (2) Angela Fuqua, (3) Holly Mrock, and (4) Tonya (last name unknown). However, Clark abandons in her response any serious effort to marshal evidence and respond to HRNI's arguments concerning Mrock and Tonya. In fact, she does not mention these alleged comparators a single time. Clark's response to HRNI's proposed statement of facts fares no better. Concerning Tonya, she admits she does not know Tonya's disciplinary history or whether Bishop knew of her misconduct. [DE 47 at ¶¶58–59.] Moreover, Clark presents no evidence concerning Mrock's alleged misconduct, disciplinary history, or management's awareness of the same. [*Id.* at ¶63.] Also, Mrock held supervisory roles as a Beverage Supervisor and later Beverage Department GM. [*Id.*] In short, I can set Mrock and Tonya aside. There simply is no evidence they are apt comparators.

Szotak and Fuqua need a deeper dive. Like Clark, they were Servers, and both were supervised by Bishop (at least in part). [DE 48-4 at ¶3; DE 48-7 at 133.] But the nature of Szotak and Fuqua's conduct differs, so I will discuss each (and its relevance to Clark) separately.

12

Let's start with Szotak. In the Spring of 2022, Clark says she observed Szotak on multiple occasions charge customers for liquor purchases with both reward or unity points and cash. [DE 47 at ¶61.] According to Clark, Szotak would pocket the difference that resulted from this double charge. [*Id.*] Clark did not report Szotak's actions to management. [DE 48-7 at 125.] HRNI eventually opened an investigation in April 2022 after numerous customers reported missing reward or unity points. [*Id.* at 125–26.] In addition, Clark says she heard from two employees that Szotak used racial slurs towards customers. [*Id.* at 121–24.] Clark did not witness these incidents. [*Id.* at 124.] Clark testified that a different manager, Clarice Hill, told Clark HRNI determined Szotak was one of the employees who had been stealing customer points. [*Id.* at 126.] Clark did not know Szotak's history of discipline under HRNI's progressive discipline policy at that time. [*Id.* at 127.] Clark heard through "other people" that HRNI terminated Szotak but seemingly rehired her one week later, though Clark admitted she did not know whether Szotak had been suspended instead. [*Id.* at 127–29.]

HRNI is correct that the nature of Szotak's conduct is dissimilar to Clark's. But Szotak's alleged conduct strikes me as *more* egregious than Clark's conduct yet received a *less* harsh punishment. This is important. *See Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012) ("Where a proposed comparator violated the same rule as the plaintiff in an equivalent or *more serious manner*, courts should not demand strict factual parallels.") (emphasis added). The problem for Clark lies not in the nature of Szotak's conduct but rather the loose, speculative evidence she uses to support her argument. At summary judgment, Clark must "marshal and present the court with the evidence she contends

13

will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). As noted above, much of Clark's evidence for Szotak consists of her own deposition testimony relaying the statements of others, so it bears mention that "[a] party may not rely on inadmissible hearsay to avoid summary judgment." *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011).

Here, Clark has not presented admissible evidence of Szotak's disciplinary history and Clark's evidence of the disciplinary consequences for Szotak's actions is murky. In *Adams v. Wal-Mart Stores, Inc.*, the Seventh Circuit considered similar generalized, loosely supported allegations of unequal treatment. 324 F.3d 935 (7th Cir. 2003). As here, the plaintiff presented two incidents that she said demonstrated unequal treatment of African American employees, but she presented no "evidence, affidavits, or deposition testimony" from the employees involved to back up her account of those incidents. *Id.* at 940. Instead, the plaintiff offered only "conclusory assertions about incidents outside her personal knowledge." *Id.* Clark presents no testimony or affidavits from Szotak or Hill (the manager she says told Clark about these incidents). In fact, Clark does not even explain the ultimate outcome of Szotak's employment or discipline with HRNI, such as if she continued to be employed or was eventually terminated.

Turning now to Fuqua, HRNI employed her as a Server from May 2021 to March 2022. [DE 48-4 at ¶3.] Fuqua says she violated numerous HRNI policies in front of Bishop, her supervisor, including signing receipts for customers, keeping personal beverages in the service area, violating serving tray rules, and failing to check customer ID for cigarette sales. [*Id.* at ¶5.] In one striking example, Fuqua says she openly refused

14

Bishop's instructions in front of Cuevas and even "threw" her badge at Bishop in an act of resignation. [*Id.* at ¶6.] Though in her deposition Fuqua says she simply handed her badge to Bishop. [DE 48-11 at 74–75.] Fuqua says the interaction took place in the food and beverage office. [*Id.*] According to Fuqua, Bishop did not discipline her for these infractions but instead disciplined African American employees, including Clark, for the same conduct. [DE 48-4 at ¶¶4, 7–11.]

Fuqua's admitted policy violations and confrontation with Bishop are analogous to Clark's conduct during the October 23, 2021, incident and her May 2022 policy violations. Fuqua and Clark violated many of the same policies, including the Cigarette SOP, the Tray Standards Policy, and the Food and Beverage Cash Handling Policy. Moreover, Fuqua and Clark both admit to disrespectful and insubordinate interactions with the same supervisor (Bishop). To diminish these similarities, HRNI attempts to highlight differences between Fuqua's and Clark's conduct. But the distinctions are pretty marginal and mostly immaterial. *See Coleman*, 667 F.3d at 846 ("So long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively useless,' the similarly-situated requirement is satisfied.") (citation omitted).

However, Clark presents no evidence showing that Brown was aware of Fuqua's conduct or had a hand in her disciplinary decisions. These are important distinctions that weigh against viewing Fuqua as similarly situated to Clark. *See Anderson v. Street*, 104 F.4th 646, 653 (7th Cir. 2024) ("Importantly, [plaintiff] does not present evidence or even allege that management knew about [the misconduct of her alleged comparator]");

15

*Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 792 (7th Cir. 2020) (noting two proposed comparators were disciplined by a different individual than the plaintiff). Fuqua testified that Bishop "had to have been aware" she signed guest receipts, though she was not certain. [DE 48-11 at 113–14.] Bishop was of course involved in the interaction with Fuqua at the beverage office, but there is no evidence of Brown's knowledge or involvement.

Fuqua presents a close call under the comparator analysis. The Court finds that Fuqua engaged in similar conduct, was subject to the same standards, and had the same supervisor as Clark. These factors all weigh in favor of finding Fuqua a proper comparator. On the other hand, scant detail on Fuqua's disciplinary history and the lack of evidence that Brown had knowledge of Fuqua's conduct weighs against her utility as a comparator. But let's suppose Fuqua is an apt comparator and the analysis shifts to whether HRNI's asserted reasons for firing Clark was a pretext. Her claim fails because there is simply no evidence that HRNI's asserted reason for firing Clark was a lie, made to cover up discriminatory motives.

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment actions. *David*, 846 F.3d at 225. Here, HRNI points to Clark's numerous policy violations, her earlier warning, and the fact that one of the acts prompting her dismissal occurred *the very same day* she was warned to not do it again. These are all race neutral reasons for firing her and the burden now shifts back to Clark to show that HRNI's stated reasons are pretext for discrimination. *Id.*

16

Pretext is "a lie, specifically a phony reason for some action" and "not just faulty reasoning or mistaken judgment." *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020) (citation omitted). "When determining whether an employer's justification is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it offered to explain the adverse action. Pretext requires more than a mistaken judgment; it requires a lie." *Hoffstead v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 132 F.4th 503, 512 (7th Cir. 2025) (internal quotation and citation omitted).

In analyzing pretext, the perceptions of the decisionmakers control. *Downing v. Abbott Laboratories*, 48 F.4th 793, 804–05 (7th Cir. 2022). "There can be no pretext if the decisionmaker honestly believes the nondiscriminatory reasons proffered by the providers of the information." *Bommiasamy v. NES Okla., Inc.*, No. 24-1654, 2025 WL 2364965, at *6 (7th Cir. Aug. 14, 2025). Here, Brown exercised decision-making authority for Clark's Final Written Warning and suspension. [DE 47 at ¶¶38–39.] For Clark's termination, Bishop exercised her decision-making authority in consultation with HRNI's HR Department. [*Id.* at ¶50.]

Clark has proffered no evidence that shows Brown's reasons for issuing the Final Written Warning and suspension were pretextual. Indeed, she does not claim Brown harbored any racial animus or other discriminatory motive at all. Perhaps recognizing this, Clark instead relies on the so-called "cat's paw" theory to claim Bishop's alleged animus infected Brown's decision. Recall that Bishop informed Brown of the details of the October 23, 2021, incident, and Brown then doled out Clark's discipline. [*Id.* at

17

¶¶38–39.] Under the "cat's paw" theory of causation, Clark must show that "(1) a subordinate actually harbored retaliatory or other unlawful animus against the employee, and (2) the subordinate's scheme proximately caused the adverse action." *Johnson v. Accenture LLP*, 142 F.4th 536, 544 (7th Cir. 2025).

Even if I were to assume Bishop (Brown's subordinate) harbored animus against Clark, Clark has offered no evidence a jury could use to find that Bishop's actions proximately caused Clark's suspension and Final Written Warning. HRNI can avoid liability under the cat's paw theory if the decisionmaker "is not wholly dependent on a single source of information and conducts [his] own investigation into the facts relevant to the decision." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (citation omitted). That's the case here. HRNI's HR Department investigated the October 23, 2021, incident, which included witness interviews and review of video surveillance. [DE 45-1 at 59–73.] Additionally, Clark's union grieved her Final Written Warning, but the Warning withstood the grievance process. [DE 47 at ¶¶40–41.] The evidence reflects that Brown's decision was reviewed and affirmed by others through both an internal and union-instigated investigation. Bishop's version of events initially relayed to Brown was but one source of information that drove HRNI's decision to maintain Brown's Final Written Warning and suspension.

The pretext analysis is much the same for Clark's termination, though Bishop's direct involvement obviates Clark's use of the cat's paw theory. Clark claims she presented "substantial" and "specific" evidence of pretext for her termination, [DE 49 at 10], but she does not support these claims with reference to such evidence. Rather, she

circles back to her arguments concerning treatment of similarly situated employees. *See Coleman*, 667 F.3d at 853 (noting "evidence of similarly situated co-workers is also relevant to the pretext inquiry"). Fuqua's conduct is indeed analogous to Clark's, and the allegations concerning Szotak are far more serious. But in addition to the evidentiary issues discussed above for both comparators, Clark's proffered evidence does not suggest HRNI's reason to terminate her was, in fact, a lie. While Bishop was involved in HRNI's decision to terminate Clark, so was HRNI's HR Department. [DE 47 at ¶¶50–51.] Over the course of a few days in May of 2022, Clark violated numerous policies, including committing the same violation the day after she received clear reprimand not to sign customer receipts. [*Id.* at ¶¶46–47.] And at least some of these additional violations were independent grounds for termination for someone, like Clark, with a final written warning. [*Id.* at ¶52.] Clark has not offered evidence that suggests HRNI's decision to terminate her based on these additional violations was a lie.

I have analyzed Clark's case under the burden-shifting analysis because Clark chose to do so in her response. *See Wilkes v. Faurecia Emissions Control Techs. USA, LLC*, Cause No. 1:22-cv-00470-HAB, 2025 WL 1141071, at * 3 (N.D. Ind. Apr. 17, 2025) ("When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the [burden shifting framework], a court should assess the case in those terms."). As discussed above, Clark violated numerous HRNI policies and procedures over the course of several months. And despite the serious confrontation with her supervisor during the October 23, 2021, incident, HRNI kept Clark as an

employee for more than six additional months. If HRNI were looking for pretext to fire Clark, it surely already had it after the October 2021 incident. But it was only after several additional policy violations in short succession that HRNI terminated Clark in May of 2022. Despite Clark's presentation of possible differential treatment of employees, she simply has not presented evidence that, when considered holistically, could allow a reasonably jury to conclude HRNI terminated her because of her race.

## Conclusion

Accordingly, Defendant HRNI Holdings, LLC's Motion for Summary Judgment [DE 44] is **GRANTED**. Summary judgment is **GRANTED** in favor of HRNI Holdings, LLC (named in the Complaint as Hard Rock Casino Northern Indiana). The Clerk is instructed to **CLOSE** this case.

**SO ORDERED**.

ENTERED: February 17, 2026.

/s/ Philip P. Simon
UNITED STATES DISTRICT JUDGE